BEER, Judge.
Plaintiff-appellant, Mrs. Deionese Vitter, wife of Henry M. Grundmeyer, sustained serious and painful injury when she slipped and fell on the premises of defendant-appel-lee, East Jefferson General Hospital (hereafter, “hospital”). Suit against the hospital and its insurer resulted in judgment in favor of the defendants with written reasons assigned. A motion for new trial was refused. Plaintiffs, Mr. and Mrs. Grundmeyer, devolutively appeal.
In their sole assignment of error, appellants assert that the trial court’s determination that the hospital satisfied its legal duty to Mrs. Grundmeyer is not supported by the evidence. Certain facts are, essentially, un-controverted: Mrs. Grundmeyer, accompanied by her son-in-law, Michael M. Lala, had visited with Mrs. Grundmeyer’s daughter, Gail, who had undergone surgery at East Jefferson General Hospital. Unusual weather conditions that day (February 9, 1973) caused snow, ice and driving rain.
That evening — after hospital visiting hours were over — Mrs. Grundmeyer decided to go to her daughter’s home for the night. Mrs. Grundmeyer’s son-in-law escorted her downstairs to the lobby at the front main entrance of the hospital where she remained inside the front door until he brought the car around. It was cold and windy outside, but the snowing had, by then, ceased. Mr. Lala was obliged to double-park in the middle of a driveway approximately a car’s width away from the curb, and parallel with the front of the hospital since other vehicles were parked adjacent to the curbing in front of the entrance to the hospital. In order for Mrs. Grundmeyer to reach his car, she had to proceed through the automatic-opening front doors, traverse an automatic door-opening walkway on the outside (39 inches wide and 49 inches long) and walk around a parked car located at the foot or curb end of the walkway. The distance from the door to the driveway curbing was approximately six feet. At approximately the point where Mrs. Grundmeyer stepped off the automatic door-opening rubber matted walkway and onto the sidewalk, she slipped and fell on the ice, sustaining painful injuries. Snow and ice were on the sidewalk around the rubber door mat previously described.
Mrs. Grundmeyer, 66 years of age at the time of the accident, stated that until she saw her son-in-law arrive with the car, she had waited inside. She testified that when she exited the hospital door, she did not observe any ice although the sidewalk appeared “wet.” She described what then transpired:
“A. I didn’t go out yet. I waited until I saw him reach over to open the door because the door looked like it was frozen. So, when I saw him reaching over and pounding on the door I started out. But, I still didn’t go right away. I waited on that — I thought it was a mat, that rubber door, that was affiliated with the opening of the door and then when I saw him pushing the door and hitting, I started out and the first step I made was on the pavement and that’s when I slid.
Q. It was on the sidewalk?
A. On the sidewalk.
Q. And, you slid?
A. I slid from the sidewalk into the driveway right up against his car. This leg went underneath his automobile.”
*636 Mrs. Grundmeyer denies that there was sand on the sidewalk and further denies that, other than the automatic door mat, rubber mats were situated nearby for the protection of visitors.
Michael Lala, Sr., Mr. Grundmeyer’s son-in-law, essentially corroborated her testimony. He, also, had slipped (but had not fallen) near the hospital entrance. Because of snow on his car’s window, he did not actually see Mrs. Grundmeyer fall. Her unfortunate situation became apparent when he opened the car door and saw her on the ground.
Edward Sessum, Sr., assistant director for building services at the hospital, testified that pursuant to instructions given to him, he supervised and actually participated in the spreading of sand and salt at the doctors’ side entrance and at the front entrance on both sides of the automatic door walkway up to the curb of the driveway, and covering a distance of about 150 feet along the curb. The sanded area was checked every half hour by Mr. Sessum and if the sand was washed away by the rains and ice had formed, his crew was instructed, in that event, to “rough up” the area and lay more sand. Although Mr. Sessum left the hospital at about 6:30 p. m., instructions were left with the “. . . later watches to maintain as safe a condition as humanly possible.” Regarding the mats, Mr. Sessum testified that approximately 20 mats were placed by him on the outside of the doctors’ entrance and at the main front entrance. Finally, Mr. Sessum testified that the hospital’s front entrance was closed to the public at some time between 9:00 p. m. and 10:00 p. m.
Thomas H. Hannon, the director of building services at the hospital, testified that although there was a shortage of mats in New Orleans on February 9, 1973, he knew that ice would form around the entrances and was, therefore, able to obtain 21 rubber mats for the purposes of providing a “. safe way for entering the hospital . . ” “. . .I'd say 4 or 5 mats were at the front entrance for the public to come in with sand on the rest of it.” To the best of his knowledge, the mats were in place by early afternoon and remained where they had been placed and were not removed at night. Mr. Hannon, on cross-examination, acknowledged that there were no warning signs nor employees at the front door entrance informing persons of the hazardous situation on the outside.
Also testifying on behalf of the hospital were Abel St. Germain, employed in the gardening and maintenance division of the hospital, and Roger D. Maddox, the operating engineer at the hospital. Their testimony corroborated that of Messrs. Hannon and Sessum. They confirmed that they had assisted in placing sand, salt and mats at the various entrances, including the one here involved, on the day in question.
Though the location and effective use of the mats and the salting and sanding were disputed factual issues, the trial court concluded:
“ * * * that the defendant hospital satisfied its legal duty to plaintiff and that the hazardous condition, due to the snow and freezing temperatures, was known to plaintiff as well as defendant. The evidence establishes that defendant did everything, and perhaps more, than required in an effort to alleviate the dangerous situation by placing mats on the walkways as well as sand and salt on the area. There is no allegation or proof that these activities caused Mrs. Grundmeyer’s fall. Defendant is not the insurer of plaintiff’s safety and under the circumstances the Court finds no violation of any legal duty owed Plaintiff and no negligence on Defendant’s part."
Appellants, contending error in these conclusions, rely upon Perkins v. Springhill General Hospital, 278 So.2d 900 (La. App.2nd Cir., 1978). In that case, the plaintiff slipped and fell in a hallway of the hospital. Water had been tracked into the corridor by persons coming into the hospital. Although mats were usually placed just inside the entrance door, on the date of plaintiff’s accident, no mats were at the entranceway. The Court of Appeal found no error in the trial court’s conclusion that *637 the hospital was negligent in failing to exercise the necessary precautions for the safety of its invitees under the circumstances.
Perkina is, however, distinguishable from the case at bar, for here the trial court concludes that the hospital did place mats where its officials felt the greatest risk of injury existed, and the trial court also concludes that the hospital officials also arranged for and carried out the salting and sanding of the front and side entrances.
The climate in southern Louisiana seldom produces heavy snowfalls and freezing rain such as to create the icy and hazardous conditions which prevailed on the night of Mrs. Grundmeyer’s fall. Yet, some response to the conditions caused thereby was clearly called for. The trial court found that certain preventive measures had, in fact, been taken by the hospital and that these measures fulfilled the duty which was owed to Mrs. Grundmeyer in the circumstances.
We find no manifest error in the trial court’s conclusions and, accordingly, affirm the judgment. Each party is to bear its own costs of appeal.

AFFIRMED.